Jack Silver, Esq. SB# 160575
LAW OFFICE OF JACK SILVER
708 Gravenstein Hwy. No. # 407
Sebastopol, CA 95472
Tel. (707) 528-8175
Email: JSilverEnvironmental@gmail.com

Jerry Bernhaut, Esq. SB # 206264
LAW OFFICE OF JERRY BERNHAUT
23 Woodgreen Street
Santa Rosa, CA 95409
Tel. (707) 595-1852
Email: j3bernhaut@gmail.com

Julio C. Gutierrez-Morales, Esq.  SB # 342613
LAW OFFICE OF JULIO C. GUTIERREZ-MORALES
708 Gravenstein Hwy. No. # 407
Sebastopol, CA 95472
Tel. (213) 800-3653
Email: jcgmlaw@gmail.com

Attorneys for Plaintiff
CALIFORNIA RIVER WATCH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RIVER WATCH, an IRC § 501(c)(3) non-profit, public benefit corporation,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>FERMA CORPORATION,<br><br>　　　　　　　Defendant.<br>_____/ | Case No.:  3:22-cv-01504<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES, AND DECLARATORY RELIEF**<br><br>**(Environmental - Clean Water Act 33 U.S.C. § 1251 et seq.)** |

Plaintiff CALIFORNIA RIVER WATCH ("RIVER WATCH") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## I.　　INTRODUCTION

1.　　This action is a citizen suit for injunctive relief, civil penalties, and remediation brought against defendants FERMA CORPORATION ("FERMA"), for routinely violating an effluent standard or limitation under the CWA by way of an order issued by the state of California with respect to such a standard or limitation in the California Industrial General Permit for Storm Water Discharges Associated

With Industrial Activity ("IGP") pursuant to CWA § 402(p), 33 U.S.C. § 1342(p), relating to the business operation known as FERMA Corporation located at 6655 Smith Avenue, Newark, Alameda County, California.

2.     On or about October 13, 2021, RIVER WATCH provided notice of FERMA's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board"), and (4) FERMA, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of RIVER WATCH's 60-Day Notice of Violations ("60-day Notice") is attached as **EXHIBIT A** and incorporated by reference. FERMA, the SWRCB, the Regional and National Administrators of EPA all received this Notice.

3.     More than sixty (60) days have passed since RIVER WATCH's Notice was properly and lawfully served on FERMA, the State Board, and the Regional and National EPA Administrators. RIVER WATCH is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under CWA § 309(g), 33 U.S.C. § 1319(g).

**II.     JURISDICTION AND VENUE**

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and 33 U.S.C. § 1365(a) (CWA citizen suit jurisdiction).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-2202 (declaratory relief), 33 U.S.C. § 1365(a) (injunctive relief), and 33 U.S.C. § 1319(d) (civil penalties).

5.     Venue is proper because FERMA is located in, and the events or omissions giving rise to RIVER WATCH's claims occurred, in this District. 28 U.S.C. § 1391(b)(1),(2). Venue is also proper because FERMA's CWA violations as alleged in this Complaint have occurred and are occurring within the District.  33 U.S.C. § 1365(c)(1).

**III.     DIVISIONAL ASSIGNMENT**

6.     Assignment of this matter to the San Francisco Division of this Court is proper as both the events giving rise to the allegations made in this Complaint and the real property which is the subject of this

1 Complaint are located in Alameda County, California.  Civil L.R.3-2(d).

2 **IV.     PARTIES TO THE ACTION**

3 7.      RIVER WATCH, is now, and at all times relevant to this Complaint was, an Internal Revenue

4 Code § 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of

5 California with headquarters located in Sebastopol, California and a mailing address of 290 South Main

6 Street, #817, Sebastopol, California.

7 8.      RIVER WATCH's organizational purpose is to protect, enhance and help to restore surface water

8 and ground waters of California including coastal waters, rivers, creeks, streams, wetlands, vernal pools,

9 aquifers and associated environs, biota, flora and fauna, and educating the public concerning

10 environmental issues associated with these environs.

11 9.      Members of RIVER WATCH donate their time and financial resources to protect, enhance, and

12 assist in the preservation and restoration of the waters of the United States including, but not limited to,

13 California's coastal waters, bays, rivers, creeks, streams, wetlands, vernal pools, and their tributaries.

14 10.     Members of RIVER WATCH reside and work throughout California including San Francisco

15 Bay and its tributaries (the "Receiving Waters" for storm water run-off from the FERMA facility), and

16 use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing,

17 swimming, hiking, photography, nature walks, scientific study and the like.  Said members' use,

18 enjoyment of, and aesthetic and recreational interests in these natural resources have been and continue

19 to be adversely impaired by FERMA's failure to comply with the procedural and substantive

20 requirements of the IGP and Federal CWA.

21 11.     RIVER WATCH has standing as an association to bring this Complaint against FERMA, as at

22 least one current member of RIVER WATCH is experiencing ongoing and continuing harm particular

23 to him or her as a specific result of FERMA's violations of the CWA and the resulting adverse effects

24 to the environment and the Receiving Waters affected by FERMA's violations of the IGP, and has

25 experienced such harm since at least the date on which RIVER WATCH served the 60-day Notice on

26 FERMA.

27 12.     FERMA's ongoing violations of the IGP and the CWA have and will continue to cause

28 irreparable harm to RIVER WATCH and its current members, for which they have no plain, speedy, or

adequate remedy.  The relief requested will redress the ongoing injury in fact to RIVER WATCH and its members.  Litigation of the claims asserted and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of RIVER WATCH.

13.     RIVER WATCH is informed and believes, and on such information and belief alleges, that Defendant FERMA is now and at all times relevant to this Complaint was, a corporation registered to do business in the State of California, and the owner and operator of the business known as FERMA Corporation located at 6655 Smith Avenue in Newark, California (the "Facility") providing fleet maintenance operations for heavy construction/demolition vehicles and material processing operations. FERMA is identified by the Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") as the IGP applicant and operator of the Facility.

**V.      STATUTORY BACKGROUND**

14.     Congress declared that the CWA was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).  In furtherance of these goals, the CWA prohibits all discharges except those in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311, 1342.  The EPA promulgates regulations to implement the NPDES permitting system at 40 C.F.R. parts 122-129.

15.     CWA § 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless such discharge complies with various enumerated sections of the Act.  Among other things, CWA § 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit or a general NPDES permit issued pursuant to CWA § 402(p), 33 U.S.C. § 1342(p).

16.     CWA § 402(p), 33 U.S.C. § 1342(p) establishes a framework for regulating municipal and industrial storm water discharges under the NPDES permitting program. States with approved NPDES permitting programs are authorized under this section to regulate industrial storm water discharges through permits issued to dischargers or through the issuance of a single, statewide general permit.

17.     Pursuant to the requirements of the CWA, the State Board developed a General Permit for Storm Water Discharges Associated With Industrial Activity ("IGP") within the State of California.  33 U.S.C.

§ 1342; 40 C.F.R. § 122.26; NPDES General Permit No. CAS000001, State Board Order No. 92-12-DWQ, amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ.  The current IGP went into effect on July 1, 2015.   To discharge storm water lawfully in California, industrial facilities must comply with the terms of the IGP or have obtained and be in compliance with an individual NPDES permit. 33 U.S.C. § 1311(a).

18.    RIVER WATCH alleges that FERMA has violated and is in violation of the substantive and procedural requirements of CWA § 402(p) and of the IGP relating to industrial activities and operations taking place at the Facility including storm water discharges.

19.    As reported on the State Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") reporting database, FERMA, rather than seeking coverage under an individual NPDES Permit, filed a Notice of Intent ("NOI") for the Facility agreeing to comply with the terms and conditions of the IGP.  The State Board approved the NOI on January 12, 2017, and the Facility was assigned Waste Discharger Identification ("WDID") No. 2 01I011218.

20.    RIVER WATCH, on the basis of eye-witness reports, records publicly available, and/or records in the possession and control of FERMA, contends that in the continuing operations of  fleet maintenance for heavy/construction demolition vehicles and related equipment, and material processing taking place at the Facility, FERMA has failed and is failing to comply with the strict terms and conditions of the IGP governing storm water discharges.

21.    IGP § VI.B. *Effluent Limitations* requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

22.    The EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).

23.    IGP § VI.B. *Receiving Water Limitations* of the IGP prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. IGP § VI.A. *Receiving Water Limitations* and § III.D. *Discharge Prohibitions* prohibit storm water discharges that cause or

Complaint

1   contribute to an exceedance of any applicable water quality standards contained in a Statewide Water

2   Quality Control Plan or the applicable Regional Board's Basin Plan.

3   24.    In addition to absolute prohibitions, the IGP contains a variety of substantive and procedural

4   requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge,

5   storm water associated with industrial activity which have not obtained an individual NPDES permit

6   must apply for coverage under the IGP by filing a Notice of Intent to Comply ("NOI").  Dischargers have

7   been required to file NOIs since March 30, 1992.

8   25.    The IGP requires that all industrial dischargers must develop and implement a Storm Water

9   Pollution Prevention Plan ("SWPPP").  IGP § X *Storm Water Pollution Prevention Plan (SWPPP).*  The

10   SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT

11   standards. IGP § X.C.  The objective of the SWPPP is to identify and evaluate sources of pollutants

12   associated with industrial activities that may affect the quality of storm water discharges and authorized

13   non-stormwater discharges from a facility, and to implement best management practices ("BMPs") to

14   reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized

15   non-storm water discharges.  These BMPs must achieve compliance with the IGP's effluent limitations

16   and  receiving  water  limitations,  including  the  BAT  and  BCT  technology  mandates. To  ensure

17   compliance with the IGP, the SWPPP must be evaluated and revised as necessary. Section X.B.  Failure

18   to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is

19   a violation of the IGP.  IGP, Fact Sheet Section I.1.  IGP §§ X.D - X.I set forth the requirements for a

20   SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team, a site map,

21   a list of significant materials handled and stored at the site, a description of potential pollutant sources,

22   an assessment of potential pollutant sources, and a description of a specific mandatory set of minimum

23   BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges

24   and authorized non-stormwater discharges.  The IGP further requires dischargers to implement and

25   maintain, to the extent feasible, any one or more of a number of advanced BMPs necessary to reduce or

26   prevent discharges of pollutants in industrial storm water discharges.  IGP § X.H.2.  Failure to

27   implement advanced BMPs as necessary to achieve compliance with either technology or water quality

28   standards is a violation of the IGP.

26.     The IGP requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the IGP's discharge prohibitions, effluent limitations, and receiving water limitations.  IGP § XI *Monitoring*.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. IGP § XI.B requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31), and two QSEs during the second half of each reporting year (January 1 to June 30); and, that the samples be collected from all outfalls identified in the SWPPP for the facility.  IGP § XI.B.2. A QSE is identified as a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area. Once the storm water samples have been collected, the IGP requires that the discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (IGP Attachment H) and upload the resulting laboratory reports within 30 days from receipt of the report onto the State Board's online Stormwater Multiple Application and Report Tracking System ("SMARTS"). IGP § XI.B.4.  Facilities are also required to conduct monthly visual observations for the presence of unauthorized non-stormwater discharges and authorized non-stormwater discharges. The sampling and visual observations must represent the quality and quantity of the facility's storm water discharges from storm events.  IGP § XI.A.

27.     The IGP requires dischargers to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. IGP § XV *Annual Comprehensive Facility Compliance Evaluation (Annual Evaluation)*. Facilities must analyze storm water samples for pH, Oil & Grease and Total Suspended Solids, as well as additional parameters

indicated in the IGP by facility type and those parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  IGP § XI.B.6.c.

28.     The EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentration levels at which storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish. The Numeric Action Levels ("NALs") in the IGP are derived from these benchmarks. The IGP incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board data set. An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range.  IGP § XII.A.

29.     Upon exceeding an applicable NAL, a discharger is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  IGP § XII.C.   For Level 2 Status, a discharger is required to submit an Exceedance Response Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  IGP § XII.D.

30.     Pursuant to the IGP, the "NPDES permit must also include additional requirements necessary to implement applicable water quality objectives or water quality standards (water quality standards, collectively)."  IGP § I.A.1.

Water quality objectives (WQOs) or water quality standards (WQS) are defined in the IGP as follows:

**Water Quality Objectives**
Defined in the California Water Code as limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area.

**Water Quality Standards**
Consists of beneficial uses, water quality objectives to protect those uses, an antidegradation policy, and policies for implementation. Water quality standards are established in Regional Water Quality Control Plans (Basin Plans) and statewide Water Quality Control Plans. U.S. EPA has also adopted water quality criteria (the same as objectives) for California in the National Toxics Rule and California Toxics Rule. (IGP Attachment C).

## VI.    REGIONAL BOARD'S BASIN PLAN

31.    In addition to the alleged violations of the terms and conditions of the IGP, RIVER WATCH alleges violations of discharge prohibitions contained in the Regional Board's Water Quality Control Plan or "Basin Plan" which discharge prohibitions are incorporated by reference as part of the compliance obligations imposed on FERMA for the Facility under the IGP.

32.    The Basin Plan is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the San Francisco Bay Region. Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses. The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives for preventing the impairment of water quality with oil sheens, turbidity, or other nuisance conditions. The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site-specific objectives for certain pollutants of concern such as lead, copper, zinc and aluminum.  The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.  The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses. The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses. The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.  The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface

of the water or on objects in the water, or otherwise adversely affect beneficial uses.  The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in specific provisions of Title 22 of the California Code of Regulations.

33.     The Regional Board has identified beneficial uses of the San Francisco Bay Region's waters, and has established water quality standards for San Francisco Bay and its tributaries in the Basin Plan.  The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning.

**VII.     FERMA'S VIOLATIONS OF THE IGP**

34.     Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit. A violation of the IGP is a violation of the Act.  *See* IGP § XXI.A.  Having agreed to its terms, FERMA has a continuing burden to demonstrate compliance with each applicable provision of the IGP.  RIVER WATCH alleges the following actions and inactions as violations of the IGP by FERMA:

35.     RIVER WATCH, following review of documents on file with the SMARTS reporting database, contends FERMA has not performed the number of sampling events required under IGP Section XI.B.2.i, despite the occurrence of QSEs, during Annual Reporting Years 2018-2019, 2017-2018, and 2016-2017.   In FERMA's 2020-2021 Annual Report, in response to question 3. "Did you sample the required number of QSEs during the reporting year for all discharge locations, in accordance with Section XI.B," the response was No and the explanation was "There was not enough run off to facilitate collection of the required number of Qualifying Storm Events during the reporting year" (2020-2021 Annual Report, Event ID # 1063342).  In FERMA's 2019-2020 Annual Report, in response to question 3. "Did you sample the required number of QSEs during the reporting year for all discharge locations, in accordance with Section XI.B," the response was No and the explanation was, "There was not enough run off to facilitate collection of a 2nd sample during the first half of the reporting year, between July and December. Shelter in place mandates prevented collection of the 2 samples required during the 2nd half of the reporting year, between January and June" (*see* 2019-2020 Annual Report Event ID #

980229).   RIVER WATCH contends there was sufficient rainfall in the City of Newark during the Annual Reporting Years to create at four QSE discharges at the Facility that were reported for each year over a 2-year period. This analysis is supported by actual rain data as well as other industrial facilities in the area which did comply and were able to sample runoff for the four QSEs required under the IGP.

RIVER WATCH contends FERMA violated section XI.B.2 of the IGP by failing to collect and analyze the required number of storm water samples.

36.    Under Section XI § B.6.e. of the IGP, a discharger must analyze all collected samples for "Additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix. Test methods with lower detection limits may be necessary when discharging to receiving waters with 303(d) listed impairments or TMDLs".   FERMA's industrial activities taking place at the Facility include "...fleet maintenance for its heavy/construction demolition vehicles and related equipment.   A limited amount of material processing occurs onsite, in which used structural steel and aluminum are hydraulically compressed into transportable blocks for recycling." (FERMA Revised 2020 SWPPP, *Introduction*, pg. 5.)   The Facility discharges into the Alameda County flood control ditch along the east side of Smith Avenue (FERMA Revised 2020 SWPPP, Section III-A, pg. 14).   The Alameda County flood control ditch discharges into Mowry Slough, a tributary of (south) San Francisco Bay - a water of the United States.   The Regional Board's CWA § 303(d) list of impaired waterbodies identifies southern San Francisco Bay as impaired for chlordane, DDT, dieldrin, dioxin compounds (including 2,3,7,8-TCDD), furan compounds, mercury, PCBs, and selenium.   There is no identification of these additional parameters in FERMA's Revised 2020 SWPPP, nor any determination as to whether there are industrial activities that could contribute to an exceedance of a water quality objective for those parameters. Furthermore, FERMA asserts,

> "As a pertinent fact relating to General Permit, the subject site is not known to involve runoff discharges into a named or otherwise designated CWA Section 303(d) listed receiving water that is impaired for turbidity, sediment, or silt: therefore, this SWPPP does not require sampling of a receiving water body.  Technically, the subject site discharges into waters of the San Francisco Bay, which is not listed." (FERMA Revised 2020 SWPPP, section IV-A8, pg. 24).

RIVER WATCH contends FERMA violated IGP § XI.B.6.e. by failing to sample for the applicable industrial parameters related to receiving waters with 303(d) listed impairments - particularly,

1   San Francisco Bay.

2   37.    The IGP requires the preparation, implementation, review, and update of an adequate SWPPP

3   which must comply with the standards of BAT and BCT.  Dischargers are required to implement BMPs,

4   when necessary, to support attainment of water quality standards. The use of BMPs to control or abate

5   the discharge of pollutants is authorized by 40 C.F.R. §122.44(k)(3) because numeric effluent limitations

6   are infeasible, and implementation of BMPs is reasonably necessary to achieve effluent limitations and

7   water quality standards, and to carry out the purposes and intent of the CWA. 40 C.F.R. §122.44(k)(4).

8   Compliance with the monitoring and reporting program and the requirement to implement effective

9   BMPs is central to an efficacious IGP program. The IGP has required all non-exempt facilities to collect

10  and accurately analyze samples from storm events, and implement effective BMPs detailed in the

11  facilities' SWPPPs that are adequate in reducing or preventing pollutants in storm water discharges and

12  authorized non-storm water discharges.

13          Discharges from the Facility site contain documented levels of zinc, copper, iron, aluminum and

14  TSS which adversely affect the aforementioned waters of the United States.  RIVER WATCH, following

15  review of documents on file with the State Board's SMARTS reporting database, contends FERMA has

16  not fully developed and/or adequately implemented a SWPPP for operations at the Facility as evidenced

17  by the fact that FERMA has failed to reduce pollutants in storm water to below water quality objectives

18  or standards. A review of FERMA's Self Monitoring Reports demonstrates discharges continue from

19  the Facility to the Alameda County flood control ditch exceeding EPA benchmarks and NALs for zinc,

20  iron, TSS and aluminum. The copper and zinc levels also exceed CTR limits. FERMA's Revised 2020

21  SWPPP provides, "Site drainage is controlled by specially-graded asphalt and concrete pavements that

22  drain to engineered collection points. Property boundaries are protected from surface run-on and runoff

23  by curbs and vegetated zones. No significant uncontrolled drainage either onto or off of the property is

24  allowed." (Revised 2020 SWPPP, section I-D., p.7).  Despite these assertions, the aforementioned

25  pollutants continue to be discharged from the Facility indicating a failure to implement adequate BMPs.

26          A review of  FERMA's reports submitted to the State Board's SMARTS database for Annual

27  Reporting Years 2018-19, 2017-18, and 2016-17, identifies the following exceedances of the NAL

28  and/or CTR limits:

Complaint

**Reporting Period (2018-2019):**                    **Event ID# / SMARTS**

**Copper, Total**

| | |
|---|---|
| 01/16/19 - 0.016 mg/L | 1099209 / 2586941 |
| 010/7/19 - 0.0072 mg/L | 1033623 / 2323266 |
| 11/29/18 - 0.064 mg/L | 1030120 / 2302831 |

**Zinc, Total**

| | |
|---|---|
| 01/16/19 - 0.31 mg/L | 1099209 / 2586941 |
| 01/07/19 - 0.13 mg/L | 1033623 / 2323266 |
| 11/29/18 - 0.73 mg/L | 1030120 / 2302831 |

**Iron, Total**

| | |
|---|---|
| 01/16/19 - 1.8 mg/L | 1099209 / 2586941 |
| 11/29/18 - 29 mg/L | 1030120 / 2302831 |

**TSS**

| | |
|---|---|
| 11/29/18 - 570 mg/L | 1030120 / 2302831 |

**Reporting Period (2017-2018):**

**Copper, Total**

| | |
|---|---|
| 03/13/18 - 0.014 mg/L | 996823 / 2135852 |
| 11/16/17 - 0.035 mg/L | 977496 / 2066383 |

**Zinc, Total**

| | |
|---|---|
| 03/13/18 - 0.5 mg/L | 996823 / 2135852 |
| 01/09/18 - 0.2 mg/L | 989165 / 2089086 |
| 11/16/17 - 0.2 mg/L | 977496 / 2066383 |

**Iron, Total**

| | |
|---|---|
| 03/13/18 - 2.9 mg/L | 996823 / 2135852 |
| 01/09/18 - 1.1 | 989165 / 2089086 |
| 11/16/17 - 4.8 mg/L | 977496 / 2066383 |

**Aluminum, Total**

| | |
|---|---|
| 03/13/18 - 1.4 mg/L | 996823 / 2135852 |
| 11/16/17 - 2.0 mg/L | 977496 / 2066383 |

**Reporting Period (2016-2017):**

**Copper, Total**

| | |
|---|---|
| 01/23/17 - 0.017 mg/L | 918558 / 1857706 |
| 12/08/16 - 0.025 mg/L | 911716 / 1832183 |
| 12/23/16 - 0.081 mg/L | 912762 / 1832172 |

**Zinc, Total**
12/08/16 - 0.21 mg/L                        911716 / 1832183
12/23/16 - 0.25 mg/L                        912762 / 1832172

**Iron, Total**
01/23/17 - 2.8 mg/L                         918558 / 1857706
12/08/16 - 1.9 mg/L                         911716 / 1832183
12/23/16 - 7.2 mg/L                         912762 / 1832172.

Copper Annual NAL is 0.0332 mg/L and the CTR limit is 0.013 mg/L. Zinc Annual NAL is 0.26 mg/L and the CTR limit is 0.12 mg/L. Iron Annual NAL is 1.0 mg/L. Aluminum Annual NAL is 0.75 mg/L.  TSS Annual NAL is 100 mg/L.

RIVER WATCH contends FERMA violated IGP § X by failing to prepare an adequate SWPPP and implement effective BMPs in the SWPPP to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges from the Facility.

38.     Although FERMA has identified certain facility-specific activities taking place at the Facility known to be sources for certain pollutants, it fails to identify and test for additional parameters associated with these facility-specific industrial activities. FERMA identifies "petroleum hydrocarbons" as a potential pollutant source (Revised 2020 SWPPP, *Site Description*, pg. 5). To test for the presence of petroleum hydrocarbons in the Facility's storm water runoff, FERMA must test for TPHg or TPHd. FERMA's current practice of testing for Oil & Grease does not include petroleum hydrocarbons. FERMA should also be testing for 6PPD-quinone, a tire preservative recently discovered to be lethal for salmonids and other aquatic organisms.

39.     RIVER WATCH is informed and believes, and on such information alleges that outdoor industrial operations and outdoor storage of materials at the Facility, as identified in the Revised 2020 SWPPP, can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

40.     RIVER WATCH  is informed and believes, and on such information alleges that pollutants are discharged from the Facility at levels which are harmful to beneficial uses of receiving waters include zinc, iron, TSS, aluminum and copper.

41.     Based on RIVER WATCH's investigation, including review of documents on file with the State

Complaint

Board's SMARTS reporting database, RIVER WATCH contends FERMA is in violation of the IGP by failing to perform the number of annual sampling events required under IGP § XI.B.2.i.for Reporting Years 2019-2020 and 2020-2021 despite sufficient rainfall events to do so.

42.     RIVER WATCH is informed and believes, and on such information alleges there are insufficient structural storm water control measures installed at the Facility, and that BMPs at the Facility are currently inadequate to prevent the discharge of pollutants to waters of the United States.

43.     RIVER WATCH is informed and believes, and on such information alleges, that since at least October 13, 2016, FERMA has failed to implement and maintain an adequate and current SWPPP for the Facility, and to comply with the provisions of its SWPPP, in violation of IGP § II.B.4.f and § X.

44.     RIVER WATCH is informed and believes, and on such information alleges, that FERMA has failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting, in violation of IGP § XI.

45.     FERMA has been and will continue to be in violation of the CWA every day it discharges storm water containing pollutants as identified in the 60-day Notice and this Complaint from the Facility without adequately implementing its SWPPP for the Facility and the BMPs required to be incorporated in that SWPPP.

46.     RIVER WATCH contends FERMA has failed and continues to fail to eliminate the ongoing discharges of polluted storm water in exceedance of EPA Benchmark, NAL and CTR limits, and therefore is in violation of the terms of the IGP.

47.     RIVER WATCH contends that from October 13, 2016 to the present, FERMA has violated the CWA by discharging pollutants from the Facility to waters of the United States without an individual NPDES permit, and in violation of the IGP.  Furthermore, RIVER WATCH contends these violations are continuing.  Discharges from the Facility site to the Alameda County flood control ditch, and in turn into Mowry Slough, a tributary of (south) San Francisco Bay - a water of the United States occur by unpermitted discharges of polluted storm water via drainages on the Facility. .

48.      FERMA will continue to be in violation of the IGP each day it discharges non-storm water pollutants and contaminated storm water from the Facility in violation of the IGP.

49.     RIVER WATCH alleges FERMA has no individual NPDES permit allowing the discharge of

Complaint

pollutants from a point source within the Facility to any waters of the United States.  RIVER WATCH alleges that industrial activities at the Facility result in the discharge of industrial wastewater without a permit. The sampling results detailed in Paragraph 37 above indicate polluted storm water continues to be discharged from the Facility to waters of the United States.

50.     Pursuant to CWA § 505(a)(1)(B), 33 U.S.C. § 1365(a)(1)(B), FERMA's industrial stormwater discharges from the Facility as detailed herein and in the 60-day Notice are violations of CWA § 301(a), 33 U.S.C. § 1311(a).  RIVER WATCH is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VIII.   CLAIMS FOR RELIEF

**Pursuant to CWA §505(a)(1)(B), 33 U.S.C. § 1365(a)(1)(B) - Violation of an Effluent Standard or Limitation under the Act by Way of an Order Issued by the State with Respect to Such a Standard or Limitation in the IGP Pursuant to CWA § 402(p), 33 U.S.C. 1342(p)**

51.     Each and every allegation set forth in this Complaint and the 60-day Notice is incorporated herein by reference.

52.     Each day since October 13, 2016 on which discharges from the Facility violate any discharge prohibitions contained in applicable Regional Board Plans (Basin Plans), or statewide water quality control plans and policies, FERMA is violating the IGP and thus the CWA.

53.     Noncompliance with the IGP constitutes a violation of the CWA.  IGP § XXI.A; 33 U.S.C. § 1342.

54.     Each violation is a separate violation of the CWA.

55.     The violations of FERMA as set forth in this Complaint are on-going and will continue after the filing of this Complaint.  RIVER WATCH alleges herein all violations which may have occurred or will occur prior to trial, but for which data may not have been available or submitted or apparent from the face of the reports or data submitted by FERMA to the Regional Board.

56.     RIVER WATCH avers and believes and on such belief alleges, that without the imposition of appropriate civil penalties and the issuance of appropriate equitable relief, FERMA will continue to violate the CWA as well as State and Federal standards with respect to the enumerated discharges alleged herein. RIVER WATCH avers and believes, and on such belief alleges, that the relief requested in this Complaint will address the injury to RIVER WATCH's members, prevent future injury, and

protect the interests of RIVER WATCH's members, which interests are or may be adversely affected by FERMA's violations of the CWA, as well as other State and Federal standards.

### FIRST CLAIM FOR RELIEF

**Discharges of Contaminated Storm Water from the Facility in Violation of Permit Conditions and the Act  (Violations of 33 U.S.C. §§ 1311(a), 1342)**

57.     Each and every allegation set forth in this Complaint and Exhibit A is incorporated herein by reference.

58.     IGP § VI.A. and VI.B *Receiving Water Limitations* require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. IGP § III.C. *Discharge Prohibitions* requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

59.     RIVER WATCH is informed and believes, and thereupon alleges, that since at least October 13, 2016, FERMA has discharged polluted storm water from the Facility into the Alameda County flood control ditch, and in turn into Mowry Slough, a tributary of (south) San Francisco Bay, in violation of the IGP.

60.     RIVER WATCH is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of IGP § III.C.

61.     RIVER WATCH is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of IGP §§ VI.A, VI.B.

62.     RIVER WATCH is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Basin Plan and/or the CTR, in violation of IGP § VI.A.

63.     RIVER WATCH is informed and believes, and thereupon alleges, that every day since October 13, 2016, FERMA has discharged and continues to discharge polluted storm water from the Facility in violation of the IGP. These violations are ongoing and continuous.

64.     Every day FERMA has discharged and continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), subjecting FERMA to civil penalties for each and every violation of the Act since July 1, 2016.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## SECOND CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate SWPPP for the Facility (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

65.     Each and every allegation set forth in this Complaint and Exhibit A is incorporated herein by reference.

66.     IGP § X requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

67.     FERMA has failed to develop and implement an adequate SWPPP for the Facility. FERMA's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, FERMA's outdoor storage of industrial materials without appropriate BMPs, the continued exposure of significant quantities of industrial materials to storm water flows, and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

68.     FERMA has further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the IGP. *See* IGP §§ X.B.1; X.C.1.b.FERMA continues to be in violation of the Act each day it fails to develop and fully implement an adequate SWPPP for the Facility. These violations are ongoing and continuous.

69.     Every day that FERMA has failed to develop and implement an adequate SWPPP for the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), subjecting FERMA to civil penalties for each and every violation of the Act since July 1, 2016. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## THIRD CLAIM FOR RELIEF

**Failure to Develop and Implement Best Available And Best Conventional Treatment Technologies at the Facility (Violations of Permit Conditions and the Act,  33 U.S.C. §§ 1311, 1342)**

70.     Each and every allegation set forth in this Complaint and Exhibit A is incorporated herein by reference.

71.     The IGP's SWPPP requirements and IGP § I.D.32 *Effluent Limitations* require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and non-conventional pollutants, and BCT for conventional pollutants.

72.     FERMA has failed to implement BAT and BCT at the Facility for its discharges of aluminum, iron, copper, and zinc in violation of IGP § I.D.32.

73.     FERMA continues to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

74.     Every day that FERMA has failed to implement BAT and BCT at the Facility for its discharges of aluminum, iron, copper and zinc in violation of the IGP is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), subjecting FERMA to civil penalties for each and every violation of the Act since July 1, 2016.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## FOURTH CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate Monitoring Implementation Plan for the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

75.     Each and every allegation set forth in this Complaint and Exhibit A is incorporated herein by reference.

76.     IGP § X.I and §§ XI.A-D require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

77.     FERMA has failed to develop and implement an adequate monitoring implementation plan for the Facility every day since at least October 13, 2016. These violations are ongoing and continuous. FERMA's ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, FERMA's continuing failure to collect and analyze storm water samples during all required QSEs, and continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants, including

aluminum, iron, copper, and zinc as the IGP requires.

78.     Every day that FERMA has failed to develop and implement an adequate monitoring and reporting program for the Facility is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a), subjecting FERMA to civil penalties for each and every violation of the Act since July 1, 2016.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

79.     Every day of violation of the IGP is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a), subjecting FERMA to civil penalties for each and every violation of the Act since July 1, 2016. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

80.     Every day since October 13, 2016 on which discharges from the Facility violate any discharge prohibitions contained in the applicable Regional Board Basin Plan, or statewide water quality control plans and policies, FERMA is violating the IGP and thus the CWA.

81.     Noncompliance with the IGP constitutes a violation of the CWA.  IGP § XXI.A; 33 U.S.C. § 1342.

**IX.     RELIEF REQUESTED**

Wherefore, RIVER WATCH prays that the Court grant the following relief:

82.     Declare FERMA to have violated and to be in violation of the CWA;

83.     Issue an injunction ordering FERMA to immediately operate the Facility in compliance with the NPDES permitting requirements in the CWA. Specifically:

    a.     Require FERMA to implement BMPs to reduce metals, aluminum, copper, iron and zinc to below the Water Quality Objectives set forth in the Regional Board's Basin Plan and the IGP.  Copper and zinc must be below the CTR limits.

    b.      Require FERMA to implement BMPs to control the discharge from the Facility to waters of the United States.

    c.     Require FERMA to adequately sample from all of discharge points on the Facility to waters of the United States.

    d.     Enjoin FERMA from discharging pollutants from the Facility and to the surface waters or ground waters surrounding the Facility until such time as FERMA has developed and implemented an adequate SWPPP;

84.     Order FERMA to pay civil penalties of $59,973.00 per day/per violation for each violation of the CWA pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1;

85.     Order FERMA to pay RIVER WATCH's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

86.     Award such other and further relief as may be just and proper.


DATED: March 7, 2022                    LAW OFFICE OF JACK SILVER

                                        By:     */s/ Jack Silver*
                                                Jack Silver

                                        LAW OFFICE OF JERRY BERNHAUT

                                        By:     */s/ Jerry Bernhaut*
                                                Jerry Bernhaut

                                        LAW OFFICE OF JULIO C. GUTIERREZ-MORALES

                                        By:   */s/ Julio C. Gutierrez-Morales*
                                                Julio C. Gutierrez-Morales

                                        Attorneys for Plaintiff
                                        CALIFORNIA RIVER WATCH

Complaint